Filed 10/10/22  McHugh v. Protective Life Insurance CA4/1

OPINION ON REMAND FROM THE CALIFORNIA SUPREME COURT

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BLAKELY McHUGH et al., Plaintiffs and Appellants, v. PROTECTIVE LIFE INSURANCE, Defendant and Respondent. | D072863 (Super. Ct. No. 37-2014-00019212-CU-IC-CTL) |

APPEAL from a judgment and an order denying motion for new trial and judgment notwithstanding the verdict of the Superior Court of San Diego County, Judith F. Hayes, Judge.  Reversed and remanded.

Winters & Associates, Jack B. Winters, Jr., Georg M. Capielo and Sarah D. Ball; Williams Iagmin and Jon R. Williams, for Plaintiffs and Appellants.

Grignon Law Firm, Margaret M. Grignon; Maynard Cooper & Gale, John C. Neiman, Jr.; Noonan Lance Boyer & Banach and David J. Noonan, for Defendant and Respondent.

Blakely McHugh and Trysta M. Henselmeier (plaintiffs) sued Protective Life Insurance Company (Protective Life) for breach of contract and breach of the implied covenant of good faith and fair dealing. They alleged that Insurance Code sections 10113.71 and 10113.72,[1] which came

---

[1] Undesignated statutory references are to the Insurance Code.

Section 10113.71 states: "(a) Each life insurance policy issued or delivered in this state shall contain a provision for a grace period of not less than 60 days from the premium due date. The 60-day grace period shall not run concurrently with the period of paid coverage. The provision shall provide that the policy shall remain in force during the grace period. [¶] (b) (1) A notice of pending lapse and termination of a life insurance policy shall not be effective unless mailed by the insurer to the named policy owner, a designee named pursuant to Section 10113.72 for an individual life insurance policy, and a known assignee or other person having an interest in the individual life insurance policy, at least 30 days prior to the effective date of termination if termination is for nonpayment of premium. [¶] (2) This subdivision shall not apply to nonrenewal. [¶ ] (3) Notice shall be given to the policy owner and to the designee by first-class United States mail within 30 days after a premium is due and unpaid. However, notices made to assignees pursuant to this section may be done electronically with the consent of the assignee. [¶] (c) For purposes of this section, a life insurance policy includes, but is not limited to, an individual life insurance policy and a group life insurance policy, except where otherwise provided."

Section 10113.72 states: "(a) An individual life insurance policy shall not be issued or delivered in this state until the applicant has been given the right to designate at least one person, in addition to the applicant, to receive notice of lapse or termination of a policy for nonpayment of premium. The insurer shall provide each applicant with a form to make the designation. That form shall provide the opportunity for the applicant to submit the name, address, and telephone number of at least one person, in addition to the applicant, who is to receive notice of lapse or termination of the policy for nonpayment of premium. [¶] (b) The insurer shall notify the policy owner

2

into effect on January 1, 2013, applied to policies issued before this effective date, and that Protective Life failed to comply with the statutes' requirements before it terminated the term life insurance policy of the decedent, William Patrick McHugh.

In the parties' various filings, including a motion for summary adjudication, motions for a directed verdict and for judgment notwithstanding the verdict (JNOV), the parties argued whether sections 10113.71 and 10113.72 applied to McHugh's policy, which was issued before January 1, 2013.  The trial court concluded the statutes applied retroactively to McHugh's policy, and that "there are questions of fact in regard to whether or not there were material breaches of the insurance contract that require consideration by the jury."  Ultimately, the jury returned a special verdict that read:

"We answer the questions submitted to us as follows:

1.      William McHugh and Protective Life Insurance Company entered into a contract.

2.      Did William McHugh do all, or substantially all, of the significant things that the contract required him to do?

Yes___1___          No___11___

or

Was William McHugh excused from having to do all, or substantially all, of the significant things that the contract required him to do?

Yes___9___          No___3___

---

annually of the right to change the written designation or designate one or more persons.  The policy owner may change the designation more often if he or she chooses to do so."

Section (b) of section 10113.72 is not a focus of the parties' arguments or of this opinion.

3

If your answer to either option for question 2 is yes, then answer question 3. If you answered no to both options, stop here, answer no further questions, and have the presiding juror sign and date this form.

3.    Did all the conditions that were required for Protective Life Insurance Company's performance occur or were they excused?

Yes____12____        No____0____

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4.    Did Protective Life Insurance Company fail to do something that the contract required it to do?

Yes____3____        No____9____

or

Did Protective Life Insurance Company do something that the contract prohibited it from doing?

Yes____11____        No____1____

If your answer to either option for question 4 is yes, then answer question 5. If you answered no to both options, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. Was Plaintiff harmed by that failure?

Yes____2____        No____10____

If your answer to either option for question 5 is yes, then answer question 6. If you answered no to both options, stop here, answer no further questions, and have the presiding juror sign and date this form.

6.    What are Plaintiff's damages?

$ _____

7.    Did William McHugh unreasonably fail to mitigate any damages between February 9, 2013 and March 12, 2013 that Plaintiffs have been able to prove?

Yes_____          No_____

If your answer #7 yes, state what amount of damages could have been avoided.

$ _____."

After the court denied plaintiffs' motion for new trial based on an inconsistent verdict and plaintiffs' JNOV, plaintiffs appealed.

Plaintiffs contended the trial court erroneously (1) declined to decide as a matter of law whether Protective Life had complied with sections 10113.71 and 10113.72, and instead permitted the jury to decide that issue; (2) declined to instruct the jury that Protective Life was required to "strictly comply" with sections 10113.71 and 10113.72; and (3) instructed the jury that McHugh had a duty to mitigate his damages. They further contended the instructional errors were prejudicial because they resulted in an inconsistent verdict.

This court affirmed the judgment on the separate ground that Insurance Code sections 10113.71 and 10113.72 did not apply retroactively to McHugh's policy, and the trial court erred as a matter of law when it ruled otherwise in denying Protective Life's directed verdict motion. (*McHugh v. Protective Life Insurance Co.* (2019) 40 Cal.App.5th 1166, 1175–1176.)

Plaintiffs appealed to the California Supreme Court, which granted review and reversed. (*McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 246 (*McHugh*).)  It concluded that sections 10113.71 and 10113.72 "create a single, unified pretermination notice scheme." (*McHugh,* at p. 240.) It held:  "The grace period and notice protections apply to all policies in effect

5

as of the sections' effective date—and in this case, nothing in the presumption against retroactive application of legislation as ordinarily applied compels another result." (*Id.* at p. 246.)

The Supreme Court rejected Protective Life's contrary arguments: "The grace period and notice provisions at issue here simply dictate the procedures for terminating policies after January 1, 2013. Applying the provisions to policies already in effect on that date does not appear to impose new or different liabilities based on earlier conduct." (*McHugh, supra,* 12 Cal.5th at p. 232.) The court remanded for proceedings consistent with its opinion. (*Id.* at p. 246.)

Plaintiffs on remand reiterate their contention that, as a matter of law, they are entitled to the policy benefits because the policy remained in effect through the date McHugh died: "[T]he record below demonstrates Protective Life did not comply with *either* the McHugh policy terms or applicable statutory provisions. Instead, it terminated McHugh's policy on February 9, 2013, well before its grace period expired, violating both the insurance contract and section 10113.71. It further sent McHugh two notices informing him that his policy would be terminated if the premium payment was not received by February 9, 2013[,] based upon an improperly calculated grace period which also did not comply with section 10113.71. Having not received that premium by February 9, 2013, Protective Life then unilaterally terminated McHugh's policy on that date, even though the grace period extended by section 10113.71 was still in effect through March 10, 2013." Plaintiffs add that "by further failing to provide McHugh with a proper pretermination notice, and then prematurely terminating McHugh's policy while the extended grace period was still running, Protective Life did not validly terminate McHugh's policy consistent with either that policy's

6

language or applicable law. As such, its attempted termination of that policy was a *legal nullity*, with the policy therefore remaining in force up through the time of McHugh's subsequent death a few months later, in June of 2013."

We conclude the jury's special verdict was contradictory and hopelessly ambiguous. Reversed and remanded for a new trial.

FACTUAL AND PROCEDURAL BACKGROUND

The California Supreme Court summarized the relevant facts as follows: "In March 2005, Chase Life Insurance Company, the predecessor in interest to [Protective Life], issued a $1 million term life insurance policy to William McHugh. The policy named McHugh's daughter . . . as the designated beneficiary and [her] mother and McHugh's successor in interest, [Henselmeier] as a contingent beneficiary. [¶] The policy was for a 60-year term, and it set out a schedule of annual premiums to keep the policy in force. For the first 10 years of the policy, the insurance policy set the annual premium at $310; after that, the premium steadily increased each year. The policy included a provision for a 31-day grace period before the policy could be terminated for the failure to pay the premium. [¶] McHugh paid all the yearly premiums through January 2012. That meant his policy was, by its terms, 'in force' until February 9, 2013, 31 days after the January 9, 2013 due date for that year's payment. On December 20, 2012, Protective Life sent McHugh a letter reminding him of the January 9 deadline and that nonpayment by February 9 would cause his policy to lapse or terminate. McHugh failed to pay the premium by the due date. Protective Life sent him a second letter on January 29, which stated that it had not received his premium payment for the year and warned that his policy would lapse if he did not make the payment by February 9, the end of the grace period. McHugh again failed to make the payment, and the policy lapsed. On

7

February 18, Protective Life sent McHugh a letter informing him the grace period had expired, but that he could reinstate the policy if it received his payment by March 12, during his lifetime. McHugh did not pay, and Protective Life formally terminated his policy. [¶] At some point close to when Protective Life sent its last letter, McHugh suffered a serious fall that left him disabled, caused him continuing physical pain, and required surgery. McHugh passed away in June 2013. Henselmeier contacted Protective Life to inquire about the status of McHugh's policy and whether a claim could be made. Protective Life advised that the policy had been terminated." (*McHugh, supra,* 12 Cal.5th at pp. 220–221.)

*Pretrial Motions*

Plaintiffs moved for summary adjudication, arguing sections 10113.71 and 10113.72 applied retroactively to the policy; therefore, Protective Life was required to provide McHugh at least a 60-day grace period and at least a 30-day written notice of lapse and termination. Plaintiffs also stated they would take the position at trial "that [Protective Life's] notice of pending lapse and termination was ineffective as a matter of law." The trial court granted plaintiffs' motion, concluding the statutes applied to McHugh's policy. It found that McHugh failed to pay his premium, and he later "acknowledged the lapse and sought to remit payment and reinstate the policy once lapsed. His efforts to reinstate the policy were unsuccessful." It ruled, "The remaining issues, such as whether [Protective Life's] conduct amounted to bad faith, whether the notices sent to [McHugh] are void, and whether either party's conduct constituted a breach of the insurance contract, shall be determined at trial."

8

*Trial Testimony*

Protective Life's assistant vice-president, Patrick West, testified by referring to the insurance policy that the "policy date," which is when coverage started, was January 9, 2005. West testified about the three notices Protective Life sent McHugh: "[W]hen [Chase] wrote this policy, they put a 31-day grace period. So according to their contract, the 31 days would have expired on [February 9, 2013]. Protective [Life] has what we call our [']prompt reinstate period.['] What we do is after the premium is not received within the first 31-day period, we send them, on their premium notice, the last notice of payment due asking for the premium." West testified Protective Life gave McHugh until March 12, 2013, to pay the premium for the policy to be "automatically reinstated" under the insurer's prompt reinstatement practice. West testified McHugh was not required to fill out any forms to obtain prompt reinstatement: "No forms, no formal reinstatement for the process. That's why we say, 'not having to provide evidence of insurability.' We will accept the premium. Basically, we extended the grace period and gave [McHugh] additional time to make the payment."

West testified that under the prompt reinstatement practice, McHugh's policy formally terminated on March 12, 2013.[2] West testified that on March 22, 2013, and May 29, 2013, after the policy had expired, McHugh telephoned Protective Life requesting insurance reinstatement forms, which were sent to him on both occasions. However, McHugh never returned a completed form.

West testified on cross-examination that sections 10113.71 and 10113.72 were incorporated into the policy: "California has a 60-day grace

---

[2] According to West, Protective Life has separate criteria for formal reinstatement, requiring the policyholder to fill out an application that Protective Life reviews. If the application is approved, the policyholder reverts to the same class as when the policy was originally issued.

9

period. And it has been deemed that this policy has a 60-day grace period. So [McHugh] had a 60-day grace period because of the statute of the law [*sic*]. He had a 60-day grace period. If he had died on [February 19, 2013], . . . he would have been insured."

West testified that if McHugh had paid his annual premium at any time before March 12, 2013, the policy would have been in effect when he died in June 2013.

James Reinholtz, an insurance agent who had been involved in selling the policy to McHugh, testified that in 2013, he received an email from Protective Life and immediately left McHugh a voicemail stating, "I just received a notice from [Protective Life. Y]our life insurance policy is cancelled and you need to give them a call and get the policy reinstated." Approximately one month later, in May or June 2013, McHugh telephoned Reinholtz, who asked if McHugh had reinstated the Protective Life policy. McHugh said something like, "I need to get a new policy, they won't reinstate me." Reinholtz helped McHugh fill out a different insurer's application form online. That new insurer sought additional information from McHugh, including whether he had existing insurance, and he responded in the negative. Reinholtz telephoned McHugh another time and told him he needed to answer the new insurer's other questions, and schedule a medical exam. McHugh never completed this application process.

*Plaintiffs' Counsel's Closing Arguments*

Plaintiffs' counsel argued to the jury that sections 10113.71 and 10113.72 applied to the policy, and summarized 10 ways in which Protective Life purportedly breached it: "Okay. So, in 2005, [Protective Life] took an

overpayment, they didn't keep good records of it.[3] In December of 2013 [*sic*] they wrote [McHugh] a notice that said, wrong date for grace expiration. On January [1, 2013,] they gave [McHugh] no explanation regarding the new laws. They didn't tell him anything. On January [28], 2013, they didn't comply with the new statutes. They gave him 10-day notices, not 30 days' notice. [¶] On February 9[, 2013], they prematurely terminated during the grace period. . . . On February [18, 2013], they sent a post-lapse notice that was inaccurate, did not comply with any statutes, misstated the grace period, misstated the dates of termination, misstated the date of the lapse. That's wrong. [¶] And on March [12], 2013, by their own admission, they did a formal termination. . . . They breached. [¶] And on that date, yeah, coverage remained in force. Coverage remained in force."

Plaintiffs' counsel also argued: "[McHugh] was given a 31-day grace period and then 31 days where he could auto-reinstate. That's not a 60-day grace period, folks. That's not just accepting the premiums. That is a flat-out misrepresentation. . . . He should have been told he had a 31-day grace [period] and then told he could reinstate without evidence of insurability."

---

3     Plaintiffs in their first amended complaint stated the policy's issue date was March 1, 2015, but they allege the record is unclear as to whether McHugh was insured in the preceding two months: "[T]he records provided to date by [Protective Life fail] to indicate when and under what circumstances [McHugh] originally paid the sum of $310, other than that the payment was made with a credit card by or before March 1, 2005, with coverage commencing in March 2005. There is no evidence [the insurers] actually agreed to or in fact insured [McHugh] during the months of January or February of 2005. [They] have produced no binder, no evidence of any temporary insurance, or anything to indicate if during the months of January and/or February of 2005 [McHugh] was in fact insured. Thus, in the year 2005, Plaintiffs allege, based on the evidence obtained from [Protective Life], that [McHugh] in fact over paid two-months of premiums which were unearned by [Protective Life]."

Counsel added, "The major breach in this case beyond terminating this policy during the middle of the grace period was the no payment on the policy."

Plaintiffs' counsel conceded in closing arguments that McHugh breached his contractual obligations by failing to pay his premium: "Here is all of Mr. McHugh's breaches and errors. He forgot to make one single payment one time in [eight] years. As counsel indicated, the defendant in his opening statement, 'everybody has missed payments. I've missed lots of payments.'" However, counsel argued McHugh had overpaid his premiums by two months and "[h]e was ahead. His policy was in force." Counsel also argued that this breach was excused: "Mr. McHugh's biggest obligation is to pay . . . premiums literally and this time period never really accrues because he had a credit. But putting that aside, on [February 9, February 18, January 1 and January 9, Protective Life] materially breached the contract. And when someone materially breaches a contract, the other person doesn't have to perform anymore. And that's what happened in this particular case. Not only did [McHugh] comply with his obligations, he had paid enough premiums. [Protective Life] breached, excusing [McHugh's] conduct."

*Protective Life's Counsel's Closing Arguments*

Protective Life's counsel countered in closing arguments that Protective Life sent McHugh notices to pay his 2013 premium in December 2012 and in January and February 2013; however, he never paid it. Agreeing sections 10113.71 and 10113.72 applied here, Protective Life also argued it provided McHugh at least the required 60 days' notice before terminating the policy: "[By] operation of law [McHugh] had a 60-day grace period. So when any [insurance] company would have said no, the law would have said he had 60 days if he died. So no matter what you say, he had 60 days. [¶] That's the one thing we agree on is that the operation of the law says that's the way the

12

policy reads and there is no dispute about that." Counsel added: "The second thing with respect to the notices, it's not tricky, it's not complicated, it's not a mystery. What the statute says with your notices, you have to send one at least 30 days before pending lapse of termination. You have to send the notice. So if the policy is pending lapse or termination, just send them a notice of that 30 days before. [¶] That's what we did in December."

Protective Life's counsel disputed McHugh's claims that his actions were excused, pointing out that, under that theory, McHugh would not "have to keep paying his premiums forever. He could have kept his policy for years, never had to pay anything."

Protective Life's counsel added that McHugh's failure to pay the premium discharged Protective Life's duties under the policy: "There will also be a charge that the judge will give you, failure of consideration. If one party materially fails to perform his promise, the other party's duty is discharged. . . . [¶] [McHugh's] deleted performance, it was discharged by a material failure of consideration, even though the party owing the duty is unaware of the failure. We can't have a duty under this policy when he didn't pay. There is no evidence or suggestion that he did. He is the one who told us that he failed to pay. He told us that in May. Two weeks before he died."

*Jury Instructions*

Plaintiffs offered two special instructions regarding strict compliance. Special instruction No. 43 stated: "As of January 1st, 2013, Protective was required to provide a written notice to the policyholder and to a designee thirty days before any lapse or termination of the policy. The notice could only be sent after a premium was due and unpaid and had to be sent prior to any lapse or termination. Until such notice was provided the policy remained in force. The law requires strict compliance with this provision."

13

Special instruction No. 44 stated: "As of January 1[], 2013, Protective was required to advise in writing that Mr. McHugh that [*sic*] he was entitled to annually designate someone to receive notices of lapse or termination. The law requires strict compliance with this provision."

The court declined to instruct the jury with those instructions: "If we're going to read the statute and the sections, then I will not have to give these." Accordingly, it instructed the jury with the language of sections 10113.71 and 10113.72 verbatim.

The court also instructed the jury that "[w]here a policy provision is mandated by statute, the policies that do not contain the required provision will be enforced as if they did." The court instructed the jury: "The word 'shall' for California insurance purposes means an action described is mandatory. If one party materially fails to perform his, her or its performance or materially delays its performance, the other party's duty is discharged."

The court instructed the jury with CACI No. 303 regarding the elements of a breach of contract claim: "To recover damages from Protective for breach of contract, Plaintiffs must prove all of the following: 1. That William McHugh and Protective Life entered into a contract; 2. That William McHugh did all the significant things that the contract required him to do, including paying all premiums owed under the contract; or; 3. That William McHugh was excused from having to pay premiums on the life insurance policy; 4. That Protective failed to do something that the contract required it to do; and 5. That Plaintiffs were harmed by Protective's breach of contract."

The court instructed the jury with BAJI No. 10.82 regarding how to evaluate breach of duty claims: "If one party materially fails to perform his, her or its promise, or materially delays performance, the other party's duty is

14

discharged.  However, a slight or partial delay or failure to perform does not discharge the other party's duty to perform.  [¶]  In determining whether a failure to perform is material, you should consider:  1. The extent of the actual performance or preparation; 2. The good faith, or lack thereof, of the defaulting party; 3. The hardship, if any, resulting to the defaulting party; and 4. The adequacy of damages to compensate the other party for the default.  [¶]  Delay in performance is material only if time of performance is of the essence, that is, if prompt performance is, by the express language of the contract or by its very nature, a vital matter.  [¶]  A duty to perform is discharged by a material failure of consideration even though the party owing the duty is unaware of the failure or has breached his, her or its own promise."

*Jury Questions During Deliberations*

During deliberations, the jury asked the court certain questions that the court answered after consulting counsel.  The jury's note No. 7 stated: "We are stuck on question 2 part b.  May we continue on to other questions due to our deadlock on question 2?  Maybe moving on will help those on the fence decide."  The court replied:  "You may consider the questions in any order you wish; however, in recording your answers to the questions on the verdict form, you must record them in the order listed."

The jury's note No. 9 asked, "Do we have to reach a supermajority (9 votes or more) on each of the parts of a question (such as #2 and #4) that give two options, in order for the verdict to be valid?"  The court replied:  "Yes, as set forth in the instructions on the Special Verdict form."

The jury asked in note No. 5:  "From BAJI 10.82 in the jury instructions, concerning "materiality" of a breach:  "3. The hardship, if any, resulting to the defaulting party"—Does this mean the hardship to the

15

defaulting party resulting from a judgment that its breach was material?  Or does it mean the hardship to the defaulting party in performing under the contract?"  The court replied:  "Hardship does not relate to personal circumstances in failing to pay premium.  Hardship does not relate to the hardship to the insurance company in paying the benefit."

*The Jury's Special Verdict*

The parties agreed to the special verdict form set forth above.  After the jury returned a verdict, the court invited the parties to address whether the verdict was inconsistent.  Protective Life's counsel argued the verdict was consistent:  "I think what [the jurors] are saying, . . . if [Protective Life] breached the contract with respect to giving the notices, that the failure to give the notice was not what caused [McHugh] harm."

Plaintiffs' counsel argued the verdict was inconsistent:  "You can't have all of this happen and not have harm to either Mr. McHugh or to the plaintiff herself."  The court concluded that the verdict was consistent.  At plaintiffs' request, the court polled the jury.

*Plaintiffs' New Trial Motion*

In moving for a new trial, plaintiffs argued the court should have instructed the jury regarding "strict compliance" and the fact that Protective Life's "failure to strictly comply left the policy in force."  They also argued the verdict was inconsistent:  "[I]t is evident the jury found that . . . McHugh was excused from performance, i.e., he was excused from paying the premium, due to the obvious premature and improper termination of coverage 31 days into a 60-day grace period.  This material breach clearly caused [Blakely] harm."  Plaintiffs also argued that insufficient evidence supported the jury's findings they suffered no harm, as well as that Protective Life's notices complied with the statutory mandates.

16

Protective Life argued in opposition to the new trial motion that based on the jury instructions and the uncontradicted evidence, the jury reasonably concluded that any harm incurred by Plaintiffs was not proximately caused by Protective Life.  The court denied Plaintiffs' new trial motion without explanation.

*Plaintiffs' JNOV Motion*

In moving for a JNOV, plaintiffs reiterated their previous argument that because Protective Life failed to comply with sections 10113.71 and 10113.72, its cancellation was invalid and the policy remained in effect when McHugh died.  Plaintiffs argued the verdict was inconsistent because "the jury excused . . . McHugh's payment of premium due to the erroneous, premature, and illegal termination of the policy on February 9, 2013.  As such, as a matter of law, [Blakely] was injured and her only measure of damages is the policy benefits [*sic*] of $1 million."  They further argued the court should strike the defense of failure to mitigate because Protective Life could not and did not prove plaintiffs had failed to mitigate their damages.

Protective Life opposed the JNOV, arguing the jury's verdict was consistent, proper and complete.  It reasoned that, "the jury could have found that Protective [Life] did not keep adequate records.  The jury also could have found that Protective [Life] should have told McHugh about the enactment of the new code sections. . . .  It is clear that neither Plaintiffs, nor the Court, nor Protective [Life] can determine exactly what facts the jury's findings were based on; therefore, it is impossible for Plaintiffs to prove 'that there is *no* substantial evidence and *no* reasonable inference [to] support the jury's verdict[,]' necessitating denial of . . . the [JNOV]."

Protective Life argued it had introduced substantial trial evidence supporting the verdict.  It reasoned that even if McHugh did not get a 60-day

17

grace period, plaintiffs still could not prevail under Civil Code section 3358, which provides: "Except as expressly provided by statute, no person can recover a greater amount in damages for the breach of an obligation, than he could have gained by full performance thereof on both sides." Protective Life concluded that because McHugh died more than 60 days after his premium was due and he never paid it, plaintiffs could not recover anything, as that would result in plaintiffs' unjust enrichment.

The court denied the JNOV motion on grounds Protective Life had adduced substantial trial evidence supporting the verdict.

DISCUSSION

## I. *Instructional Error Claim*

We first address plaintiffs' claim the court erred by failing to instruct the jury Protective Life had to strictly comply with the requirements of sections 10113.71 and 10113.71; and by instructing regarding mitigation of damages.[4]

We conclude the court did not err by declining to instruct the jury with the plaintiffs' special instructions on "strict compliance," and instead instructing with the language of sections 10113.71 and 10113.72. It is well

---

[4]    The court instructed the jury regarding failure to mitigate: "A party injured by a breach of contract must mitigate his damages and is not entitled to any loss which could have been avoided by reasonable means." It further instructed with CACI 358: "If Protective breached the contract and the breach caused harm, Plaintiff is not entitled to recover damages for harm that Protective proves Plaintiff could have avoided with reasonable efforts or expenditures only during the period between February 9 and March 12, 2013. You should consider the reasonableness of. . . McHugh's efforts in light of the circumstances facing him at the time, including his ability to make the efforts or expenditures without undue risk or hardship. [¶] If . . . McHugh made reasonable efforts to avoid harm, then your award should include reasonable amounts that he spent for this purpose."

18

settled that " ' "Instructions in the language of an applicable *statute* are properly given." ' " (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1131 [interpreting instruction using the language of Government Code section 835]; *Garrison v. Pearlstein* (1924) 68 Cal.App.334, 340 [" 'Laying down the law in the words of the law itself ought not to be pronounced to be error.' "]; *Pemberton v. Arny* (1919) 42 Cal.App. 19, 24 ["there was no error in giving the instruction in the words of the law itself"].) We point out the court also instructed the jury that where a policy provision is mandated by statute, the policies that do not contain the required provision will be enforced as if they did.

We are mindful this is an action for breach of contract that must be decided on its own particular facts. Plaintiffs rely on cases that are factually distinguishable from the present case and therefore have no applicability. (*Mackey v. Bristol West Ins. Servs.* (2003) 105 Cal.App.4th 1247, 1258 [involving an automobile insurance]; *Kotlar v. Hartford Fire Ins.* (2000) 83 Cal.App.4th 1116 [involving a commercial insurance policy]; and *Lee v. Indus. Indem.* (1986) 177 Cal.App.3d 921 [involving a fire insurance policy].)

The court instructed the jury on the plaintiffs' burden of proof to prevail in an action for breach of contract. In addition to proving Protective Life breached the contract, plaintiffs had the burden of proving they were harmed by the breach. The court noted there were factual disputes to be decided by the jury. Under these circumstances, there was no error in refusing plaintiffs' special instructions.

We reject plaintiffs' argument the court erred by instructing the jury on mitigation of damages. It is clear from the verdict form that the jury never reached that issue. Further, the court instructed the jury as follows: "After you have decided what the facts are, you may find that some instructions do

19

not apply.  In that case, follow the instructions that do apply and use them together with the facts to reach your verdict."  We assume the jury followed that instruction.  (*Gray v. Wagner* (1969) 272 Cal.App.2d 671, 672.)

## II.  *Inconsistent Verdict*

We next address plaintiffs' claim that the verdict was inconsistent. They contend the jury's "yes" answer to the second part of question 2, asking if McHugh was excused from doing all or substantially all of the significant things that the contract required him to do, conflicted with its "no" answer to question 5, asking if McHugh was harmed by the failure of Protective Life to do something that the contract prohibited it from doing. Respondents counter that the verdict was "fully consistent."

## A.  *Applicable Law*

"[A] special verdict is that by which the jury finds the facts only, leaving the judgment to the Court.  The special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the Court but to draw from them conclusions of law." (Code Civ. Proc., § 624.)  "A special verdict is 'fatally defective' if it does not allow the jury to resolve every controverted issue."  (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325.)  " 'We analyze the special verdict form de novo' as a matter of law."  (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1242.)

"Where special verdicts appear inconsistent, if any conclusions could be drawn which would explain the apparent conflict, the jury will be deemed to have drawn them."  (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424.)  However, this court has held that "[i]f the jury has been discharged and the verdict is 'hopelessly

20

ambiguous,' the judgment must be reversed. [Citation.] A court reviewing a special verdict does not infer findings in favor of the prevailing party [citation], and there is no presumption in favor of upholding a special verdict when the inconsistency is between two questions in a special verdict. [Citation.] 'Where there is an inconsistency between or among answers within a special verdict, both or all the questions are equally against the law.' [Citations.] 'The appellate court is not permitted to choose between inconsistent answers.' [Citation.] . . . [¶] If a verdict is not 'hopelessly ambiguous,' the court may 'interpret the verdict from its language considered in connection with the pleadings, evidence and instructions.' " (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092.)

B. *Analysis*

The first part of the special verdict form's question 2 asks: "Did . . . McHugh do all, or substantially all, of the significant things that the contract required him to do?" The jury answered "No." The second part of question 2 asks, "or [w]as . . . McHugh excused from having to do all, or substantially all, of the significant things that the contract required him to do?" The jury answered, "Yes."

McHugh's only obligation was to pay the premium within the 60-day grace period (or the 62-day period allowed by Protective Life). Accordingly, the jury's affirmative answer to the second part of question 2 can only mean McHugh was excused from paying the premium. To put the answer to question 5 in context, we must first set forth the question and answer to question 4, which states, "Did Protective Life . . . fail to do something that the contract required it to do?" The jury answered, "No." Question 4 next asks, "or [d]id Protective Life . . . do something that the contract prohibited it from doing? The jury answered, "Yes." Question 5 asks, "Was Plaintiff harmed by

21

that failure?"  The jury's "No" answer can only mean that the policy lapsed as a result of McHugh's failure to pay the premium.  The answers to the second part of question 2 and  question 5 are inconsistent.  Nonetheless, Protective Life insists the verdict was consistent.

In closing, Protective Life's counsel urged the jury to answer "No" to both parts of question 2:  "Did William McHugh do substantially all the significant things the contract requires him to do?  Was [he] excused from having to do all of the substantial things required to do?  The jury charge is no, he didn't because he didn't pay.  And was he excused?  No. No. No.  [¶] Why?  What do we know?  What reason do we have in a discussion about -- what reason do we have that he was excused?  So the answers are no and no. And you stop.  You stop.  There is no breach of contract.  You don't have to go any further.  You stop."[5]

---

[5]    Protective Life's counsel continued instructing the jury on how to fill out the special verdict form, insisting McHugh had failed to pay the premium: "You don't perform, if you don't pay.  How can you perform unless you have paid your premiums?  That's the way this agreement works.  And Protective failed to do something the contract required it to do?  Never.  Did Protective do something the contract prohibited them from doing?  No, of course not.  And then was plaintiff harmed by that failure?  No.  [¶]  But you don't have to get there.  You stop on number two.  You stop.  You can't go any further.  We didn't breach the contract.  [¶]  [McHugh] did not do what he was required to do and there is no reason for that.  . . .  [¶]  Again, if this was —is two or three weeks I was in the hospital, but this was months, and months and months.  And we have nothing, other than he knew and said, ['Y]eah, I didn't pay my premium['] and still did nothing."

In rebuttal, plaintiffs' counsel argued their preferred way for the jury to answer the special verdict form: "The first question, that [McHugh] entered into a contract, we proved by a preponderance of the evidence.  That's all we have to do, is that . . . McHugh did all or the significant things that the contract required him to do. He didn't make the payment that month. But he had a credit.  And we believe it's clear that he did everything he was significantly supposed to do.  He was late.  And if he had been told,

If the jury had accepted Protective Life's counsel's closing argument and answered "no" to both parts of question 2, then the jury would have signed the verdict and not answered question 5.  In short, Protective Life is now arguing that a verdict substantially different from the one it urged the jury to render in its favor is a consistent verdict.

On appeal, Protective Life argues that the verdict was consistent: "[Protective Life's counsel] maintained at closing argument that Protective 'complied with' the statutes and indeed 'more than complied with' them.  The jury agreed, finding that Protective had not 'failed to do' anything the statutes, as incorporated into the policy, 'required it' to do.  To the extent that the jury concluded that Protective did something that the policy 'prohibited'—in purporting to lapse the policy before the true lapse date—longstanding California law gave the jury ample latitude to conclude that any such error had not caused Plaintiffs 'harm.'  [¶]  This finding also was consistent with the rest of the verdict.  Plaintiffs assert otherwise at various points in their brief, claiming that the jury found that McHugh was excused 'of *any* further performance,' that he never had to pay another premium, and that as a result the policy never could have lapsed.  But that is not what the jury found.  A grace period 'does not change the date when the premium is due.'  [Citation.]

---

maybe he could have done something a little different.  But he didn't know.  But we still think that his failure was not a material breach of the contract.  but even if it was, the second question should be answered yes as well.  Was . . . McHugh excused from having to do all or substantially all of the significant things that the contract required him to do?"

Plaintiffs' counsel also argued in rebuttal:  "So clearly, so clearly . . . McHugh never failed to do anything reasonable.  The only thing he did the entire time, he missed one premium because of some reason we will never know.  And simply because you miss one payment does not put you in material breach of the contract."

So even when a policy provides a grace period, the 'default occurs' as of 'the [original] due date,' when the insured fails to pay. That means that when McHugh failed to make the payment on January 9, he was in 'default.' The jury's finding that McHugh was excused from having to do 'all, or substantially all, of the significant things that the contract required him to do' thus meant he was excused from paying *during the 62 total days* he had between the grace period and the prompt-reinstate period. It did not mean that he was excused from paying premiums even after then. Those findings were fully consistent with its finding that, because Protective gave McHugh until the end of that grace period to pay his premium, any purported lapse of the policy on February 9 caused no harm to either McHugh or Plaintiffs. The trial court rightly allowed the jury's verdict to stand."

We are not persuaded by Protective Life's argument. Because Protective Life was only willing to accept McHugh's premium payment through the end of the prompt reinstatement period, its claim—that the jury's "yes" answer to the second part of question 2 refers solely to the 62-day period encompassing the grace period and prompt reinstate period—is tantamount to saying that McHugh was excused from paying the premium. Logically, if McHugh was excused from paying the premium, the insurance policy would have remained in effect at the time of his death. The jury's answer to question 5, that plaintiff was not harmed, directly contradicts the jury's determination that McHugh was excused from paying the premium.

In light of the jury's responses to the special verdict form, its questions to the court during deliberations, counsels' closing arguments, and our de novo standard of review, we conclude the verdict is inconsistent and "hopelessly ambiguous." (*Zagami, Inc., supra,* 160 Cal.App.4th at p. 1092.) We

24

therefore order a new trial.  There being no lawful verdict, the issues regarding the court's denial of the JNOV are moot.

## DISPOSITION

The judgment is reversed and the matter is remanded for a new trial. The parties are to bear their own costs on appeal.


O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


AARON, J.